My name is Lee Phillips. I'm an attorney in sole practice in Flagstaff, Arizona. I represent Manley Barton. I conducted his administrative appeal hearing many years ago, and I've represented him throughout the course of his effort to obtain his relocation benefits. I think the question I would ask the Court to focus on was that, was Mr. Barton, Manley Barton, was he a self-supporting head of household when he moved off of the Hopi Partition lands? And why that is so significant is that's really at the core of the decision ultimately in this case, is when did my client move off, move off, not just temporarily leave, but the O'Neill's own documents document the fact that he moved off with his mother and his sister in April of 1986. So he was, at that time, he would have been 20 years old. He at that time was supporting himself for several, since 85 when he graduated from high school and began working two jobs, construction at a gas station. And so he was 20, he was in earned over $4,000, according to the Social Security information, and over $14,000, I think, in 1986. So he clearly at the time moved off with an adult, independent, and self-supporting. The government's position is, and this sort of evolves, they initially indicate that they believe that, and this is also the hearing officer's position, that is that in 1984, his grandparents, Howard and Ruth Begay, who lived at the HPL home site with my client and his family, Maria's mother and Marcella, his sister, the grandparents moved one quarter mile from the original Hopi Partition Lands home site across the fence to what now is Navajo Partition Lands. So the home site at that point, in a sense the family separated. Howard and Ruth, the grandparents, moved a quarter mile away. Oh, now they're off of the Hopi Partition Lands. But Maria, Marcella, and Manley remained on the Hopi Partition Lands. And that was the consistent testimony of the witnesses at the hearings. That's the consistent information from the O'Neill records. And we would ask the Court to ultimately make the determination that he did, in fact, move off with his sister and his mother April of 1986. What changed, counsel, in April of 1986, when you say that's when the move was? Because there was a lot of temporary waste. I mean, high school and when, you know, the family lived outside the site, but would come back. But what changed exactly? What were the major  changes? April 4, 1986, according to O'Neill's own records, the mother, Marie, relocated from the HPL into a relocation home, which was located on the NPL, the Navajo side. So like his grandparents, he moved, but not until they moved in 84, he moved in 86. And the records document that Ruth, I'm sorry, Marie, his mother, his sister, Marcella, and Manley all relocated on the same date, which was April 4, 1986. And that's, you can find that in the record at, let's see, oh, the Relocation Commission, if you're not aware, they keep track of all these individuals' information and they update it periodically. And in this case, the document is at page 248 and 259 of the ER. And at 249, there's a document that indicates that Manley and Marcella, on the form it says, did they relocate with Marie, the mother? And it says yes in both situations. And it's our position that from 1986, April of 1986, the family lived off of the HPL. But by that time, Mr. Barton had clearly become a self-supporting priority. And prior to that move in April, when Manley Barton was not at the home site, was he staying in Holbrook or where was he putting his bed? I mean, where was he staying? Yes. From the time Manley was seven years old, his parents, his father and his mother, moved to Holbrook, not moved, but they rented an apartment in Holbrook. And that residency pattern continued all the way through 1986, which was Marie, the mother, was working at the dormitory in Holbrook. Manley was staying with his mother and his sister, Marcella. And the residency pattern consistently during all those years until 1986 was that the family of Bartons were temporarily away, the mother for employment, my client and his sister for education. And so when he graduated in 1985, he was 18 years old, 19 years old, and he immediately went to work, according to the testimony of all the witnesses, that he immediately went to work on the two jobs, as I said, earning over $4,000 in 1985. At that point, he would be considered, typically the presumption would be he would be a separate household. And so that What is the correct standard for analyzing whether the temporarily away exception applies? Well, I think the general rule that the government seems to follow is that if, what they're really talking about is residency, right? Because to be eligible, when he moved off, he had to be a legal resident. We're saying that was 1986. They're saying it's either The test usually is, what was the intent of the applicant? And the intent is sort of measured by the manifestations of the person's intent to remain on the HPL. And in this situation And what's your best authority for, that supports the definition or the standard that you just articulated? Charles versus O'Neill, which was a decision of, I believe, of this court. No, it was a decision that the district court was affirmed by But Charles wasn't dealing with a temporarily away exception, correct? I mean, Charles was dealing with the determination about residency, which is the first element, where that, in this case, is acknowledged by both sides, that the residency requirement is met. We're talking about the head of household. So you would agree that Charles was not a decision relating to the temporarily away exception, right? Yes. And I think we cite in our papers several O'Neill cases where they discuss what is temporarily away. And the difference is, your intent, when you leave, are you leaving with the intent to stay away, off of the HPL, like a move off? Or are you temporarily away for either education or employment, which is recognized by O'Neill as legitimate reasons for the families and their family members to move off, or at least temporarily, because there's no employment on the reservation at that time, and there's no schools. So education for the kids and employment for the parents, all of that has to occur off the HPL. And that's what happened in this situation. The apartment, on the weekends, and all the testimonials consistently, while they were in school, Marcella and Manley, they returned to the HPL home site every summer vacation and every other weekend during the school year. And once Mr. Barton became 18 and became self-employed and self-sufficient, at that point he was in the process of demonstrating, not that he was moving, but that he was temporarily away for education initially and then employment. And that changed in April of 1986 when his relocation benefits moved from her HPL residence into the relocation home, April 4th, 1986. And the commission's documents make it clear that Marcella and Manley moved off that same date, April 4th, 1986. That's the last time that they left with the intention of being permanently gone. How does one draw the line between temporarily away part and the residence part? You say it's a matter of intent. I understand that. But intent exactly to do what? Is it because you subjectively feel that's your home, that's where you keep your main belongings, or that's where you're hoping to return? What precisely is the intent that we're looking for here? Well, I guess the difference between a move off versus temporarily away would be that there's a repeated pattern of leaving for employment and or education, but returning to your ancestral homeland, your home site on the HPL. So it's an intent to return? Yes. Much like we talk about residency in other contexts. If you have an intent to return, that we sort of utilize that framework for determining not just, and if I understand your argument correctly, you're saying we should sort of impute that standard that we use for the residency element to the head of household because, of course, when they decided to stay or return. Yes. I'm sure you're aware, but Marie, his mother, she was certified because, not because she was a resident, she was certified because she was temporarily away, transporting. So I think I understand your argument, and it makes sense that the determination of how long you stayed has a component that is part of a residency analysis. My question is, how would the IHO know to apply that standard that's in Charles that typically really relates to the first element in a head of household analysis? What direction, what case, what regulation, what would they look to, what policy, so that as we sit here today, we can consider whether or not the IHO's failure to do so was arbitrary and capricious? I guess the issue is, again, it goes back to what was the intent. If there's a pattern of leaving temporarily for workers or employment, that normally would qualify as temporarily away, and that would make you a continual resident, even though you were temporarily away. In April of 1986, the difference is the mother and both of her children literally packed up and moved away, and they moved into the new relocation home that was built. So you're just saying it was so obvious that the IHO should have considered that, that it's arbitrary and capricious for it not to have done so. Yes, because they found that O'Neill found that the mother was eligible, certified for benefits, because she was temporarily away, and that's what they usually refer to as substantial and reoccurring back and forth. And that was not the mother. She was certified based on that. She wasn't a full-time resident, because she, like the kids, was back and forth from Holbrook the entire time. But both the kids were with her all of those times. I mean, they were usually minors for most of those times. She had a vehicle. Every time vacations, summer vacations, holidays, she and the kids would go back to their home site on the HPL, where they lived in a traditional mud wood hogan that in 1984, when Marie's parents, the grandparents, relocated it one quarter mile away, the grandfather, who was basically considered the owner of that Hopi petition lands home site, he quit-claimed to his daughter Marie and mother of my client, Manly. Howard, the grandfather, quit-claimed what was his hogan, that home site primarily, but the one hogan, the Bartons, my client and his mother, had lived in as a permanent residence, HPL residence, the entire time, from the time he was seven until he moved in. Counsel, let me ask you this. It's my understanding that your client testified at his hearing that after 1984, he visited the HPL home site all the time. But he didn't expand on what that meant. Wasn't it his burden to be more specific? The testimony of working the weekends for his job and visiting his yelling father, doesn't that support the hearing officer's conclusion that your client's trips to the HPL home site were infrequent? No. Why? Well, because, I mean, there are certain limitations when you're living away for work or school, and that is there's typically during the week you're working, which would mean off of the HPL, and weekends, holidays and summer vacations, they would be back on their hogan on the HPL home site. So, again, it's the mother and the kids, if you looked at all of the testimony, again, they were both, the girl, Marcella and Manley, my client, were basically kids until 1985 when Manley turned 18. Then he was a junior in high school. Then he stayed for another year, going to high school in Holbrook. And in 1986, when his mother's home was built, the three of them, and again, it's not just me saying that, O'Neill's own records will show Marie Barton moved April 1986. Okay, so can you She was a resident because of her recurring contacts. Can you address for me the customary use area policy? So I'd like to know first, you know, to let us know how or why it's applicable here, and then what's your best authority to support the position that it applies to show that your client maintained his residency on the HPL until he became head of household? Well, again, I want the court to understand that the mother and the two children were a nuclear family. So she had one vehicle. They all lived on the HPL. They all commuted back and forth to Holbrook. And that continued to happen up until all three of them moved permanently in April of 1986. The customary use issue is what the government has come to recognize is when they divided the land between Hopi people and Navajo people and the people had to move to the other side, that if that partition of the two sections, HPL and MPL, if that partition cut through, split your home site, part of your home site. So I think, at least from my perspective, I understand what the policy is. And I understand that here we had that. There was a partition through the land that's the subject of your client's claim. Correct. And so what I want to know is what's your best authority to support that it shows your client maintained his residency on the HPL until he became head of household? Well, again, in 1984, the grandparents relocated. And they moved a quarter mile across the line. Do you have a case site or something you can point to? Because the customary use area policy is not – it is a policy of the agency, right? This is not something that we can find in regulation. Correct. So essentially we're looking to the case law to determine when and whether it can apply for determination of the head of household. So that's what I'm really looking for from you. All right. Well, again, it's in the O'Neill's regulations. It's in the manual that Susan Crystal, the first attorney for O'Neill, created, which describes how you would determine eligibility temporarily to a head of household. I mean, there are so many cases, literally in every situation. Okay. So what's your best case? And then you're out of time, so I'd like you to answer this question, and then we'll give you two minutes on the clock for rebuttal. If I may, I'd ask to be allowed to come back if I can. I'd like to check the date and name of the cases. Okay. All right. Thank you. Mr. Peterson. Good morning, Your Honors. May it please the Court. My name is Ezekiel Peterson, here on behalf of the Office of Navajo  O'Neill's decision that plaintiff had not shown that he was entitled to relocation benefits was both reasonable and supported by substantial evidence. Plaintiff did not carry his burden to show that he was a resident of the Hopi partition lands or HP. So can you point to where in the record the IHO explains why it did not apply the customary use area policy in its decision? I don't think the IHO addressed that specifically. So its failure to address that, wouldn't that alone constitute an arbitrary and capricious action? No, Your Honor, because the customary use policy clearly does not apply here, and I'd like to address that because I think we would respectfully push back on something that you stated during the opening. There is no evidence in the record here that this was a partition through land that was both on the NPL and the HPL when the partition happened. So for the customary use policy to apply, there has to have been land that a family or an individual used for traditional Navajo uses that went across both what became the HPL and the NPL. And that's simply, as the district court noted, not the factual scenario we have here. Rather, what we have is a family who was using land on the HPL entirely, as far as the record goes, and then relocated, agreed in 1984 to surrender their interest in that land, in the buildings on the land, accepted relocation benefits, and relocated to the NPL. So for the customary use policy to apply, there had to be some evidence, plaintiffs would have had to provide some evidence, that the family was using both the NPL and the HPL for traditional uses before the partition actually happened. The record here is entirely devoid of that type of evidence. So the customary use policy is not a basis to overturn the IHO's decision. I'd like to discuss why... Would you agree that if the land, the factual contention I think that you're raising about whether or not the land was partitioned, if it were, and the customary use policy was applicable for that reason, the failure by the agency to set forth any of its reasons for not applying the policy would constitute an arbitrary and capricious action? I think the agency's action could be upheld on the basis that the IHO laid out, because plaintiff had failed to provide evidence of his residency at all, regardless of whether or not the customary use area, or customary use policy applies. Plaintiff had failed to provide the types of evidence that when he became head of household in 1984, he actually was a resident of the HPL. And I want to get into a little bit of what the testimony actually was at the hearing there. The hearing officer cited testimony from the hearing that nobody lived on the HPL home site in 1985 after the relocation in 1984. The plaintiff lived and worked in Holbrook and across... But that was quoting the aunt's testimony that nobody lived there, quote, like 24-7. That's true. She didn't say nobody ever lived there. That's true, Your Honor. In fact, the testimony from many others, including Richard and Mildred, as well as Mr. Manley Begay, was quite consistent that they would return every other weekend during summers and for ceremonies. All that was uncontradicted, right, that they would come back every other week? So the testimony that they would return for summers and during ceremonies, I think... And every other week, very often. Yes, Your Honor. There's two parts, two answers to that. One is that testimony referred to the pre-1984 relocation pattern of activity. And after that 1984 relocation, the testimony of Richard, the testimony of Mildred, and the testimony of Ruth Ann is consistent that the family kept livestock on the HPL property. They returned to the HPL property for ceremonies to use the hogan on the HPL property because they did not have one on the NPL property. And that they used the HPL property for storage and for keeping things and for overflow. So Richard testified to that. Mildred testified to that. Ruth Ann testified to that. But none of those family members testified that anybody was actually living at the HPL... Was there clear delineation, a change in practice that they testified to? Those who testified to the frequency of every other weekend, for instance, did they say starting in 1984 when the grandparents moved out, that all changed? Or is that just by inference? I would have to double check the record, Your Honor. But I think record page 61 is Richard Begay's testimony. Record page 76, Mildred says, after the grandparents moved, we continued to make use of the HPL home site because we had our livestock there and had belongings at the old home site. So, counsel, how much of your argument actually relies on the hearing officer's conclusion that the appellant's residency on the HPL home site extinguished when the grandparents relocated? Your Honor, I think that's... I think either reason supports the IHO's conclusion that plaintiff was not entitled or did not show he was entitled. But doesn't the hearing officer's conclusion conflict with the regulation defining residence, which, as counsel for the appellant has clearly stated, it has to do with the individual's intent to reside in a particular location and the manifestations of that intent? No, Your Honor, because it's plaintiff's burden to show residence, and plaintiff did not show through evidence about his intent to reside at the HPL home site when he became head of household or manifestations of that intent to reside at the HPL household after the relocation. Well, except the IHO's ruling, its conclusion, his conclusions of law, third paragraph, is regardless of the facts. It says that it ended in 1984 when the grandparents relocated and that regardless of the family's use, they were no longer, the home site was no longer available for, you know, as a legal residence. It was a conclusion as a matter of law. That's true, Your Honor. And we think that conclusion is true, but also the hearing officer made the determination that plaintiff did not show substantial visitation from 1984 on, did not show residence from 1984 on at record page 19 and 20 because nobody was living at the HPL home site at that time. So both of those things are true. Both plaintiff could not have established residence as a matter of law and plaintiff did not prove, as he was required to by the regulations, by showing his intent to reside at the home site or manifestation of that intent that he actually did reside at the HPL home site. But I think the standard of review is very important here because under the substantial evidence standard, this court must uphold the agency's action as long as it is based on relevant evidence as a reasonable mind might accept as adequate to support the conclusion even though it's possible to draw two inconsistent conclusions. Except where there's a legal conclusion, that's review de novo. Yes. Yes, Your Honor. But the conclusion about plaintiff's proof of whether or not he had shown intent to reside or manifestations of that intent at the HPL home site when he became head of household in 1985 is reviewed under the substantial evidence standard. So you would agree, based on this last statement that you just made, that the intent, the decision in Charles relating to the manifestations of intent is the right standard to consider the head of household residence issue as well? Yes, Your Honor. I think legal residence in both the first factor and the second factor of the test for eligibility for relocation benefits is demonstrated by intent to reside and manifestations of that intent. And the preamble to O'Neill's regulations, which this court has discussed and the district court has discussed, gives some examples of kinds of things that plaintiffs can come forward with in their hearing or in their case to show intent and manifestations of that intent. That's stuff like grazing permits, employment records, ownership of livestock, other relevant data that can show manifestations of intent to reside at a specific site. And plaintiff didn't present that evidence in this case. All that we have here was plaintiff's own testimony that he was at the HPL home site, quote, all of the time. Certainly, the hearing officer... The card also lists Manley as one of her family members. Yes, Your Honor. What impact does this fact have on establishing his move-off date? I don't think that shows that Manley was a resident of the HPL as of 1986. There's this period of time in 1985 where he became head of household. That's undisputed and was required to show that he was living on the HPL at that point in order to be eligible for relocation benefits. But he has not met that burden here. His mother was certified for relocation benefits in 1981, so prior to the time he became head of household. So certainly it makes sense that a plaintiff would be listed on that record because in 1981 he was a dependent minor who presumably had the imputed residence of his mother. But plaintiff did not come forward at the agency level to show that he was a resident of the HPL in 1985 when he became head of household. Certainly, the evidence at least does not compel the opposite conclusion. And that's what's really required here for this court to overturn the agency's decision and reverse the district court under the substantial evidence standard. What about if the agency, the IHO below, didn't mention the supporting evidence, that is the testimonies of several family members about the frequency by which Mr. Manley Barton would return home with his family, the fact that they kept possessions there, kept clothes there, tended to livestock, did maintenance around the house. The IHO basically sort of said, well, they're so busy, one must wonder when they could have visited Jadito, et cetera, et cetera, and said that the visits were limited to ceremonies or social interactions with certain family members, but really didn't say much about, didn't deal with the testimonies of not only Mr. Manley, but the father, I think it was, and the aunt about the frequency and the nature of their home visits. Would that warrant at least remand for reconsideration? I don't think so, Your Honor. Certainly, the IHO could have been more thorough and more detailed, but under the substantial evidence standard, I don't think that raises this case to the level of a remand. Additionally, I think based on the evidence here, there would be a harmless error argument that the evidence shows that Plaintiff did not prove that he was a resident of the HPL at the relevant date. But yes, we would ask that if this Court concludes that the record does not support O'Neill's decision, it remand to the agency for further analysis and consideration of Plaintiff's residency in 1985 when he became head of household. Because interestingly, the IHO determined that most of the witnesses, including Mr. Begay, were credible. Yes, Your Honor. And the only one that had some doubt of it, I think it was Ruth, Aunt Ruth. Yes, Your Honor. Who was the one who made the statement about not being there 24-7 because she wasn't, was there, her timeline was a little bit mixed up. So it seems a little odd that he credited those who sort of supported the testimony of all the indicia of frequency and not the other. Yes, Your Honor. I would say that it's not a full this witness wasn't credible finding. It's a finding that her credibility was limited by her inability to recall specific dates. So if she had said in 1984 this was happening, then maybe that was something that would be afforded less credibility. But her testimony was after the relocation. No one was living at the HPL home site 24-7. That's the kind of major life event that's not tied to a specific number, a specific date. We don't think that's affected by the partial adverse credibility finding. So I want to go back to the factual discrepancy that we were talking about earlier. I want you to look at ER 14 and tell me if you agree that here the IHO did find that Manley's family had a second home site that became part of the NPL. It's in the finding of fact number three. Okay. Sorry, could you repeat the question part of that? Sure. Yeah. I read paragraph three in the IHO's finding of facts to say that in fact there was a second home site that became part of the NPL, that it was in fact partitioned. That's at ER 14. And so I want to understand why you disagree with the notion that the customary use policy is applicable when, in fact, the findings of fact from the IHO clearly state that the land was, in fact, partitioned. Your Honor, well, so the land was partitioned for the Navajo use, but the findings of fact doesn't make it clear that plaintiff's family used that specific parcel of land for traditional uses before the partition. There was a discussion about whether or not they satisfied the customary use policy for purposes of granting that finding of residency. That's not that you shouldn't have undergone the analysis in the first instance, which the IHO doesn't do here. Well, there's simply no evidence in the record that would even set off that discussion in the first place. There's no evidence that plaintiff's family was using that NPL site before the partition actually happened, and I don't believe that's an argument that the plaintiff made before the IHO either. Ultimately, we believe that the IHO's reasoning was supported by substantial evidence. His decision was reasonable in this court to affirm. Thank you, Your Honor. Thank you. Mr. Phillips, we'll put two minutes on the clock for your rebuttal. Let me pick up on the question that you just posed, and that is the issue of the NPL, HPL home site. You're correct. The IHO in this case found that the family, the extended family, Howard and Marie at the top, Marie the mom and the kids, that in 1984, he indicates that the grandparents moved to a site that he acknowledges was preexisting, and that was part of the home site, right? The grandparents moved in 1984. They moved into a new relocation home. There was no hogans for ceremonies. There was no livestock permit allowed on that land. So all of the family continued to maintain the HPL home site because that's where the water was, the wood was, that's where the livestock was. And Manly, once his father died in 1985, he was the man of the house. So were there arguments made to the IHO in the first instance, what I think your friend said right before you sat down, which is there were no arguments made in the first instance about customary use on this land? I would disagree, and I think even the IHO says in his findings, the fact that you just mentioned, that the family had a home site on the MPL. I mean, that's the traditional Navajo situation, winter camps, summer camps, and the livestock moved, which causes them to move back and forth. And so preexisting was the fact that they used the MPL, but in 1984, they actually moved to the MPL portion of their traditional land, customary use area, and into the home. But again, his record is very clear that all the livestock, all the hogans required for the ceremonies, all of those remained on the HPL. In fact, the one hogan that Marie Barton and her kids lived, she turned that over when she relocated in 1986. There's photographs showing the hogan was appraised value, the outhouse was an appraised value. So in 1986, that hogan was still in existence on the HPL, which supports all of the testimony of the people who testified at the hearing. I don't want to forget to get back to you, Judge, on the cases. I would say the original case that I think of in a temporary way would be the Mike case. I think it's Dora Mike, but it's Mike versus O'Neill. That's several years ago, probably 10. Recently, very recently, and within the last two months, district courts in Arizona, in two separate cases, Edward Bitsui versus O'Neill and Bruce Yazzie versus O'Neill, their denial was reversed based on the fact that the HO gave virtually no credibility to the consistent testimony of witnesses about their coming and going and who lived where and when they moved. And also Powell versus O'Neill is a case I'd ask you to consider well, because in that case, Powell is a student whose mother works at the same dormitory that Marie Barton worked at. The kid and his mother and Powell, she was a dorm attendant just like Marie was. Initially, hearing us, we found that Mr. Powell, the son, had moved off of HPL to move to Holbrook when he was going to school there. That was reversed by the district court who found that he was temporarily away for education while he was at the dormitory and that he never actually moved off until well after the fact that he qualified for benefits. Okay. Thank you, Mr. Phillips. You're out of time, but we appreciate your argument, and this case has been submitted. Thank you so much. Thank you.
judges: DESAI, ALBA, Chen